# UNITED STATES DISTRICT COURT

NORTHERN _____ DISTRICT OF _____ ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

**CRIMINAL COMPLAINT**

v.

**FILED**

JN 3-18-08
MAR 1 8 2008

ARTURO ACOSTA,
aka "Ice Cream" and "Creme"

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

CASE NUMBER:

**08CR 224**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.  On or about July 18, 2007, in Cook County, in the Northern District of Illinois, defendant(s)

did knowingly and intentionally distribute and possess with intent to distribute a controlled substance, namely, in excess of 5 grams of mixtures containing cocaine base in the form of crack cocaine, a Schedule II Narcotic Drug Controlled Substance;

in violation of Title  21 , United States Code, Section  841(a)(1) .

I further state that I am a Special Agent for the Federal Bureau of Investigation and that this complaint is based on the following facts:

**See attached affidavit**

Continued on the attached sheet and made a part hereof:    **X**  Yes  ____ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

March 18, 2008 _____
**Date**

at    Chicago, Illinois _____
**City and State**

MAGISTRATE JUDGE ARLANDER KEYS _____
**Name & Title of Judicial Officer**

_____
**Signature of Judicial Officer**

STATE OF ILLINOIS      )
                       ) SS
COUNTY OF COOK         )

## AFFIDAVIT

I, Jason Rahoy, being first duly sworn on oath, depose and state as follows:

## I.  PRELIMINARY MATTERS

1.      I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), and am empowered by law to investigate and make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2.      This Affidavit is made in support of a criminal complaint charging that on or about July 18, 2007, ARTURO ACOSTA, also known as ("aka") "ICE CREAM" and "CREME," distributed and possessed with the intent to distribute a controlled substance, namely, in excess of 5 grams of mixtures containing cocaine base in the form of crack cocaine, in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

3.      I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since July 2006, and am presently assigned to the FBI's Joint Task Force on Gangs, Chicago Field Division, assigned to identify, disrupt, and dismantle Hispanic gangs operating in the Chicago, Illinois, area.

4.      I am responsible for investigating crimes that involve, among other things, the

1

unlawful importation of illegal narcotics (21 U.S.C. §§ 952, 960 and 963), the possession with the intent to distribute controlled substances and the distribution of controlled substances (21 U.S.C. §§ 841 and 846), the use of communication facilities to further these offenses (21 U.S.C. § 843(b)), as well as the related laundering of monetary instruments (18 U.S.C. §§ 1956 and 1957). In conducting these investigations, I have used a variety of investigative techniques and resources in investigations which have included physical and electronic surveillance, monitoring court-authorized wiretaps, the use of cooperating witnessess ("CWs") and informants, and securing other relevant information using other investigative techniques. Through these investigations, my training and experience, and conversations with other Special Agents, as well as other law enforcement personnel, I have become familiar with methods used by narcotic traffickers to safeguard their narcotics, to distribute narcotics, and to collect and launder related narcotic proceeds.

5.      As a result of my participation in this investigation, my review of reports prepared by FBI agents and Task Force Officers from the FBI's Chicago Field Office, and Chicago Police Department ("CPD") officers (collectively, "agents"), I am familiar with all aspects of this investigation as described in this Affidavit. The information contained in this Affidavit includes the result of surveillance conducted by FBI agents and CPD officers, independent investigation by the FBI, information gathered from cooperating witnessess, and agents' review of consensually recorded conversations. Since this affidavit is being submitted for the limited purpose of establishing probable cause to arrest the individual

identified above, I have not included each and every fact known to me concerning this investigation.

6.     Based on the information contained in his Affidavit, I submit that there is probable cause to believe that on or about July 18, 2007, ARTURO ACOSTA distributed and possessed with the intent to distribute a controlled substance, namely, in excess of 5 grams of mixtures containing cocaine base in the form of crack cocaine, in violation of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Section 2.

## II.    PROBABLE CAUSE

### A.    FBI CW

7.     CW is a cooperating witness for the Chicago Field Office of the FBI, who has been cooperating with the FBI since February 2007.[1]    CW has provided information regarding participants in the drug trafficking operation that has been corroborated by consensually recorded phone conversations, body recordings, physical surveillance, and information provided by other CWs.

8.     On February 15, 2007, CW positively identified ARTURO ACOSTA from a Chicago Police Department mugshot photograph.  The CW advised that he/she has known

---

[1] The CHS has been arrested 12 times for misdemeanor offenses and 3 times for felony offenses. CHS' arrests include domestic battery, battery, possession of illegal substances, distribution of illegal substances, criminal trespass, unlawful use of a weapon, and traffic offenses.  The CHS has one felony conviction for delivery of cocaine.  The CHS was arrested in early 2007 for possession of crack cocaine with intent to distribute.  The CHS has been cooperating with law enforcement in an effort to gain a possible reduction in his/her sentence once charged.  The CHS entered into the United States illegally and is a citizen of Belize.  The CHS has received a Significant Public Benefit Parole (SPBP) so that his/her current immigration status here in the United States is legal.  The FBI requested this status to enable the CHS to continue his/her cooperation with the FBI in its investigation.

ACOSTA for approximately eight years, and that he/she and ACOSTA are both associated with the Almighty Latin King Nation ("ALKN").

9.      On February 15, 2007, the CW advised agents that ARTURO ACOSTA's then-current cellular telephone number was (773) 419-1881.  The subscriber of this telephone number is GLORIA SALGADO, 4522 North Central Park in Chicago, Illinois.  According to the CW, ACOSTA lives on North Central Park Avenue, and drives a Gold Ford Expedition.

**B.      RECORDED CONVERSATIONS, SURVEILLANCE, AND RELATED INVESTIGATION**

### June 13, 2007 Telephone Calls

10.     On or about June 13, 2007, at approximately 8:25 p.m., CW placed a consensually recorded telephone call in the presence of agents, to Individual A at telephone number (773) 259-7108.[2]  According to the CW, on multiple prior occasions, he/she cooked cocaine in to crack cocaine at Individual A's residence.  Individual A answered the call,[3] and

---

[2] The recorded conversations throughout this Affidavit have been summarized, and parentheses have been placed around language that represents my or other agents' understanding of what is being said during the recordings, based on the contents and context of the conversations, my experience as a law enforcement officer, and the experience of other law enforcement officers in this investigation. In addition, language that is quoted from the recorded conversations throughout this Affidavit is based upon agents' review of the recorded conversations. Quoted material is not intended to be a final transcription of the audio recordings from which the quotes are taken.

[3] CHS identified Individual A by voice subsequent to the consensual recordings. Furthermore, during recorded conversations CHS referred to Individual A by his/her first name. Finally, during particular recorded calls, Individual A arranged to personally meet with CHS and that meeting was surveilled by law enforcement. The voice in the telephone calls was identified by agents as the voice in the body recording of the controlled drug purchase occurring at the residence of Individual A.

CW told Individual A that CW wanted to "take care of that, you know what I'm talking about?" Individual A said yes. CW said, "I want to, uh, woo woo woo. I don't want to talk on the phone about it" which meant, based on CW's prior dealings with Individual A and CW's regular usage of these terms, to process powder cocaine into crack cocaine. Individual A confirmed that CW was going to come and CW told Individual A that CW would be coming and would "take care of you," which meant that CW would pay Individual A for processing the powder cocaine into crack cocaine. Individual A said ok.

11.    On or about June 13, 2007, at approximately 8:33 p.m., CW placed a consensually recorded telephone call in the presence of agents, to ACOSTA at telephone number (773) 419-1881.  This call was answered by voice mail, and CW did not leave a message.

12.    On or about June 13, 2007, at approximately 8:34 p.m., CW received a consensually recorded telephone call in the presence of agents from ACOSTA.[4]  CW said he wanted "to get this tomorrow," referring to cocaine.  CW asked ACOSTA "you know what I'm talkin' about, Joe?"  ACOSTA said yes, and told CW that they would talk about it the following morning.  CW reiterated that CW wanted to make sure ACOSTA could "get it"

---

[4] The identification of ARTURO ACOSTA in this Affidavit is based upon the following: First, CHS identified ACOSTA through a photograph.  Second, CHS identified ACOSTA by voice subsequent to the consensual recordings. Third, during recorded conversations CHS referred to ACOSTA as "CREME," which according to CW is a known alias for ACOSTA. Fourth, during particular recorded calls, ACOSTA arranged to personally meet with CHS and that meeting was surveilled by law enforcement. Finally, the voice in the telephone calls was identified by agents as the voice in the body recording of the controlled drug purchase.

(provide the cocaine), otherwise CW could purchase the narcotics from Individual G, however "his shit not good" (the quality of Individual G's cocaine was poor). CW also said that he wanted "three," by which CW meant three ounces of powder cocaine. ACOSTA confirmed that he could "get it" (provide cocaine to the CW). CW then asked ACOSTA what time, and ACOSTA told CW to call him the following morning (June 14, 2007) after approximately 10:00 a.m.

### June 14, 2007, Attempted Purchase of Powder Cocaine

13.    On or about June 14, 2007, at approximately 11:31 a.m., CW placed a consensually recorded telephone call to ACOSTA at telephone number (773) 419-1881. CW asked ACOSTA "can I grab that (the cocaine) now?" ACOSTA replied "I have to speak with my guy and . . . see if he's got it," and then told CW that he would then call CW back.

14.    On or about June 14, 2007 at approximately 11:55 a.m., CW received a consensually recorded telephone call from ACOSTA, who was using telephone number (773) 419-1881. CW asked what was going on and ACOSTA replied "nothin' . . . can you believe that?" CW asked "how long?" ACOSTA said, "I don't know, he said later. He'll call me later." ACOSTA told CW that "he" (his supplier) would call ACOSTA later if "there is some," and ACOSTA would then contact CW.

### July 18, 2007, Purchase of Cocaine and Processing of Cocaine Into Crack Cocaine

15.    On or about July 18, 2007, at approximately 11:22 a.m., CW placed a consensually recorded telephone call to Individual A at telephone number (773) 274-9431.

During this call, CW asked Individual A who was present at her residence. Individual A replied that her boyfriend was home, but that her daughter, Individual B, was not at her residence at that time. CW asked Individual A "can I come do that?" which meant processing the CW's powder cocaine into crack cocaine at Individual A's residence. Individual A said yes, and told CW to come to her residence soon because Individual B was not there. CW told Individual A that he/she was going to contact "Ice Cream," which according to CW is an alias for ACOSTA. Individual A told CW to let her know (if CW was coming over).

16.    On July 18, 2007, at approximately 11:39 a.m., CW placed another consensually recorded telephone call to ACOSTA at telephone number (773) 419-1881. This call was answered by voice mail, and CW left a message that CW "wanted to get that thing we talk[ed] about" and for ACOSTA to return CW's call. CW explained, based on prior dealings and conversations with ACOSTA, that this meant purchase powder cocaine.

17.    On July 18, 2007 at approximately 11:53 a.m., CW placed another consensually recorded telephone call, to ACOSTA at telephone number (773) 419-1881. During this call, CW told ACOSTA that he/she was trying to get the "thing we talk[ed] about . . . the three thing" (three ounces of cocaine). CW also confirmed that the cocaine would cost "800 each" ($800 per ounce). ACOSTA agreed to provide the cocaine for that price. CW also told ACOSTA that "me and [Individual A] are gonna cook it up" (process that powder cocaine into crack cocaine). CW asked ACOSTA if he was ready at that time, to which ACOSTA

7

replied that he has to call his "guy" (ACOSTA's supplier) who has the cocaine.

18.    On July 18, 2007 at approximately 12:22 p.m., CW placed a consensually recorded telephone call to Individual A at telephone number (773) 274-9431. During this call, CW told Individual A that CW would arrive at her residence in 30 to 45 minutes. Individual A told CW "you can do what you got to do" (process the powder cocaine into crack cocaine), to which CW replied that "you gonna do it" (Individual A was going to process the powder cocaine into crack cocaine). Individual A advised CW to hurry up because her mother would return to the apartment before too long and that they "can't do it once my mother comes and shit."

19.    On July 18, 2007 at approximately 1:46 p.m., CW placed a consensually recorded telephone call to ACOSTA at telephone number (773) 419-1881. This call was answered by voice mail, and CW left a message that CW was going to proceed to ACOSTA's residence at that time.

20.    On July 18, 2007 at approximately 1:57 p.m., agents searched CW for any weapons, narcotics and money in CW's possession, with negative results. CW agreed to wear a concealed audio and video recording device and transmitter. At approximately 1:58 p.m., agents activated recording devices and a transmitter. Agents then transported CW to CW's vehicle, which was similarly searched for weapons, narcotics and money with negative results

21.    On July 18, 2007 at approximately 2:20 p.m., agents provided CW with $2,500

8

in United States Currency ("USC"), of which $2,400 was for the purchase of cocaine from ACOSTA, and $100 was to pay Individual A for processing the powder cocaine provided by ACOSTA into crack cocaine. CW then departed the vicinity in CW's vehicle and proceeded to 4522 North Central Park in Chicago, which according to CW is ACOSTA's residence. Surveillance agents ("surveillance") observed CW continuously while en route to ACOSTA's residence, between the residence of ACOSTA and the residence of Individual A (6117 North Kedzie), and then later from 6117 North Kedzie to the predetermined post-deal meeting location.

22.    According to CW, while en route to ACOSTA's residence, CW placed approximately four or five telephone calls to ACOSTA, all of which were not answered. CW received a telephone call from Individual A while en route to ACOSTA's residence. CW's portion of this call was recorded. During this call, Individual A asked CW if CW was still coming to Individual A's residence. Surveillance observed CW arrive at ACOSTA's residence. CW rang the door bell and knocked on the door; however, no one answered.

23.    A little while later, CW placed another telephone call to ACOSTA, who answered the phone. CW's portion of this call was recorded. According to the CW, during this call ACOSTA asked CW if CW was ready, and asked if CW wanted "three" (ounces of cocaine). CW replied in the affirmative, and told ACOSTA that he/she recently left ACOSTA's residence. CW requested that ACOSTA bring the cocaine to Individual A's residence. ACOSTA agreed.

24.     CW proceeded to Individual A's residence and arrived at 3:00 p.m. After arriving, CW observed Individual B at the residence, and told her "hey, I want to cook some shit here, that's cool? I want to throw you some money." Individual B replied "that's fine, cause I got no dough, I'm broke."

25.     Approximately five minutes after arriving at the residence, Individual A told CW that she did not have baking soda or baggies (baking soda is used to process powder cocaine into crack cocaine). According to CW, he/she provided Individual A five dollars, and asked Individual A to go to the store to purchase baking soda and baggies.

26.     At approximately 3:08 p.m., approximately ten minutes after the CW arrived at Individual A's residence, surveillance observed ACOSTA arrive at Individual A's residence. Accompanying ACOSTA was his son (Individual C), who was approximately seven years old, and Individual D.

27.     After ACOSTA entered the residence, CW provided him with $2300. ACOSTA counted the money and told CW that he was short by $100. CW then provided ACOSTA another $100 that CW had inadvertently put in another pocket to pay Individual B.[5]

28.     At approximately 3:20 p.m., surveillance observed a silver colored Nissan, IL license plate #Y47-8436, proceeding northbound in the alley behind 6117 N. Kedzie Avenue, Chicago, IL. A vehicle registration check revealed the registered owner to be Individual A,

---

[5]CW later explained to agents that CW had originally placed $100 aside at agents instruction to pay Individual A, but then also withheld $100 from the remaining money when he paid ACOSTA.

6117 N. Kedzie, Chicago, IL. At approximately 3:26 p.m., surveillance observed Individual A return to the residence at 6117 N. Kedzie carrying a white grocery bag.

29.    ACOSTA then told CW that someone would arrive in five minutes (with the cocaine). A few minutes later, at approximately 3:35 p.m., ACOSTA received a telephone call from an unidentified individual. During this call, ACOSTA provided directions to Individual A's residence and told the individual that ACOSTA's truck was at the corner of Granville and Jersey (Kedzie and Jersey are both the 3200W street in Chicago. They are the same street. The name changes depending how far north or south you are.)

30.    At approximately 3:35 p.m., surveillance observed ACOSTA exit the residence at 6117 North Kedzie Avenue, accompanied by Individual C. According to CW, Individual D remained inside the residence at this time.

31.    Surveillance observed a gray colored Ford Taurus, IL license plate # G32-2696 driving northbound on North Kedzie, parking on the east side of North Kedzie, south of Granville. After ACOSTA and Individual C exited 6117 N. Kedzie Avenue, surveillance saw them walking southbound on Kedzie. Surveillance later observed ACOSTA sitting in the gray colored Ford Taurus, parked on the east side of Kedzie facing north. Shortly afterward, the Taurus, without ACOSTA, was observed proceeding northbound on Kedzie and turning eastbound on Granville Avenue.

32.    At approximately 3:40 p.m., CW received a call from ACOSTA telling CW to open up the door because he was in back of the house. Both sides of the conversation are

11

audible in the recording. According to CW, ACOSTA returned through the rear door of Individual A's residence with a brown paper bag. From inside the brown, paper bag, ACOSTA retrieved two clear, plastic baggies containing suspected powder cocaine. In the recording, the sound of rustling paper is audible in the background as ACOSTA appears to be looking down in the direction of his hands. As ACOSTA appeared to hand something to the CW, CW said, "I got this. This three?" ACOSTA said "yeah." CW said, "Later thanks, King Love." ACOSTA asked, "you got your weigh?" CW replied, "I got this." According to the CW, one of the baggies contained approximately two ounces of cocaine and the other baggie contained approximately one ounce of cocaine. ACOSTA said, "Let me see how, you know, you're going to do it." CW understood this to mean that ACOSTA would watch the powder cocaine being processed into crack cocaine. Individual A explained to ACOSTA how to cook a small quantity, "just an eight-ball" into crack cocaine.

33.    Individual A then proceeded to process a small quantity of the powder cocaine provided by ACOSTA into crack cocaine. Individual A processed the cocaine on the kitchen stove, and when she asked CW for assistance, CW handed her items. During this time, ACOSTA watched the powder cocaine being processed into crack cocaine.

34.    After this first portion of powder cocaine was processed into crack cocaine, ACOSTA departed the residence with Individual C and Individual D. At approximately 3:45 p.m., agents and/or officers observed ACOSTA, and Individuals C and D, leaving 6117 N. Kedzie, Chicago, IL, getting into the gold colored Ford Expedition, and driving away from

this location.

35.    Individual A continued to process the powder cocaine into crack cocaine in small quantity portions. CW transferred the crack cocaine into a baggie. At approximately 5:10 p.m., the CW departed from the residence at 6117 N. Kedzie Avenue, got into his/her vehicle, and proceeded to a predetermined location.

36.    At approximately 5:24 p.m., the CW arrived at the predetermined location. FBI agents retrieved from CW a quantity of suspected crack cocaine that was contained in a clear plastic baggie. Agents deactivated the recording devices and transmitter. Agents then searched CW and CW's vehicle for weapons, narcotics, and money with negative results.

### July 18, 2007, Telephone Call About 3 Ounce Transaction

37.    On July 18, 2007 at approximately 6:20 p.m., CW placed a consensually recorded telephone call in the presence of agents, to ACOSTA at telephone number (773) 419-1881. During this call, CW told ACOSTA that "it cooked good," but complained that the quantity of powder cocaine was reduced when it was processed into crack cocaine. ACOSTA told CW that this was because Individual A did not "expand" it (process the powder cocaine so that it yields a greater quantity of crack cocaine). CW asked ACOSTA if he knew another individual who could process powder cocaine into crack cocaine for CW, to which ACOSTA replied that he knows Individual F who could do it. ACOSTA then assured CW that the quantity of cocaine he (ACOSTA) provided CW was "three" (ounces of cocaine), and told CW that he/she "should have weighted it up." The CW replied that

he/she forget his/her scale. CW told ACOSTA that CW would purchase "four" (ounces of cocaine) next time.

38.    On August 27, 2007, the mixtures purchased from ACOSTA and then processed from powder cocaine into crack cocaine by Individual A were tested by the Drug Enforcement Administration North Central Laboratory. The test indicated that the substance was cocaine base, and weighed 47.2 grams.

Based on the foregoing, I believe there is probable cause to support the requested criminal complaint.


FURTHER AFFIANT SAYETH NOT.

_____
Jason Rahoy, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
this 18th day of March, 2008.

_____
ARLANDER KEYS
MAGISTRATE JUDGE


14